No. 25-2539

# In the United States Court of Appeals for the Third Circuit

JOHN WILLIAMS,

*Plaintiff-Appellant*,

v.

BRITTANY HUNER *et al.*,

*Defendants-Appellees*.

*On Appeal from the United States District Court for the Eastern District of Pennsylvania*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

Elizabeth B. Wydra
Brianne J. Gorod
Joshua D. Blecher-Cohen
Nina G. Henry
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1.1, *amicus curiae* states that no party to this brief is a publicly held corporation or entity, issues stock, or has a parent corporation.

## TABLE OF CONTENTS


| | Page |
|---|---|
| TABLE OF AUTHORITIES | iv |
| INTEREST OF *AMICUS CURIAE* | 1 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| ARGUMENT | 5 |
| I. Title II of the ADA Bars Disability Discrimination in Prisons, Including Failures to Accommodate | 5 |
| A. As Its Text and History Show, Title II Broadly Forbids Disability Discrimination by Public Entities Like Prisons | 5 |
| B. There Is No Carveout to Title II for Prison Medical Care | 7 |
| C. Even if Title II Had a Medical Carveout, Disability Accommodations Under Title II Are Not Medical Care | 9 |
| D. “Judge-Made” Exceptions Cannot Overwrite Title II’s Clear Text and Foreclose Required Accommodations | 14 |
| II. The District Court Erred in Dismissing Williams’s ADA Claim | 17 |
| CONCLUSION | 24 |

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Alexander v. Choate*,
469 U.S. 287 (1985) ........ 10

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ........ 7

*Brooks v. Colo. Dep't of Corr.*,
12 F.4th 1160 (10th Cir. 2021) ........ 2

*Bryant v. Madigan*,
84 F.3d 246 (7th Cir. 1996) ........ 3, 14-16

*Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*,
796 F.3d 293 (3d Cir. 2015) ........ 7

*Dooley v. Wetzel*,
957 F.3d 366 (3d Cir. 2020) ........ 4, 17

*Erickson v. Pardus*,
551 U.S. 89 (2007) ........ 17

*Fauconier v. Clarke*,
966 F.3d 265 (4th Cir. 2020) ........ 5

*Furgess v. Pa. Dep't of Corr.*,
933 F.3d 285 (3d Cir. 2019) ........ 7, 16, 18, 24

*Haines v. Kerner*,
404 U.S. 519 (1972) ........ 17

*Hall v. Higgins*,
77 F.4th 1171 (8th Cir. 2023) ........ 18

*Higgs v. Att'y Gen.*,
655 F.3d 333 (3d Cir. 2011) ........ 4, 17

*Hill v. Assocs. for Renewal in Educ., Inc.*,
897 F.3d 232 (D.C. Cir. 2018) ........ 23

*Jackson v. Dameron*,
171 F.4th 641 (4th Cir. 2026) ........ 11, 12

**TABLE OF AUTHORITIES – cont'd**


**Page(s)**

*Jaros v. Ill. Dep't of Corr.*,
684 F.3d 667 (7th Cir. 2012) .................................................................. 10, 18

*Kiman v. N.H. Dep't of Corr.*,
451 F.3d 274 (1st Cir. 2006)...................................................................... 8

*Kokinda v. Pa. Dep't of Corr.*,
663 F. App'x 156 (3d Cir. 2016) ...................................................... 14, 15, 20, 21

*Kokinda v. Pa. Dep't of Corr.*,
No. 2:15-cv-1593, 2016 WL 695819 (W.D. Pa. Jan. 13, 2016) ............ 15

*Koon v. North Carolina*,
50 F.4th 398 (4th Cir. 2022) ...................................................................... 2

*Lesley v. Chie*,
250 F.3d 47 (1st Cir. 2001)......................................................................... 8

*Mala v. Crown Bay Marina, Inc.*,
704 F.3d 239 (3d Cir. 2013)........................................................................ 4

*Marshall v. Fed. Express Corp.*,
130 F.3d 1095 (D.C. Cir. 1997).............................................................. 23

*McDaniel v. Syed*,
115 F.4th 805 (7th Cir. 2024) ............................................................... 13, 18

*Montanez v. Price*,
154 F.4th 127 (3d Cir. 2025) .................................. 2, 7, 9, 10, 15, 18, 19, 21, 24

*Nat'l Fed'n of the Blind v. Lamone*,
813 F.3d 494 (4th Cir. 2016) .................................................................. 10

*Nuñez v. Prime Care Health, Inc.*,
No. 19-CV-0859, 2019 WL 1400466 (E.D. Pa. Mar. 27, 2019)........... 14, 20, 21

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999)..................................................................................... 8

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998)..................................................................... 2, 3, 5, 6, 8, 16

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Pierce v. Cnty. of Orange*,
526 F.3d 1190 (9th Cir. 2008) .......... 18

*Pierce v. District of Columbia*,
128 F. Supp. 3d 250 (D.D.C. 2015) .......... 10

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) .......... 8

*Shorter v. United States*,
12 F.4th 366 (3d Cir. 2021) .......... 17

*Simmons v. Navajo Cnty.*,
609 F.3d 1011 (9th Cir. 2010) .......... 15

*Tennessee v. Lane*,
541 U.S. 509 (2004) .......... 10

*Tudor v. Whitehall Cent. Sch. Dist.*,
132 F.4th 242 (2d Cir. 2025) .......... 23

*United States v. Georgia*,
546 U.S. 151 (2006) .......... 2, 12

*Williams v. Sec'y Pa. Dep't of Corr.*,
117 F.4th 503 (3d Cir. 2024) .......... 6

Statutes, Regulations, and Legislative Materials

28 C.F.R. pt. 35, app. B .......... 7

42 U.S.C. § 12101 .......... 6

42 U.S.C. § 12102 .......... 5, 17

42 U.S.C. § 12103 .......... 17

42 U.S.C. § 12131 .......... 4, 5, 10, 17, 22

42 U.S.C. § 12132 .......... 1-5, 7, 9, 12, 17-19, 24

Americans with Disabilities Act of 1990,
Pub. L. No. 101-336, 104 Stat. 327 .......... 6

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Hearing on H.R. 2273, the Americans with Disabilities Act of 1989: Joint Hearing Before the Subcomms. on Emp. Opportunities and Select Educ. of the Comm. on Educ. & Lab.*, 101st Cong. (1989), *reprinted in* 2 H. Comm. on Educ. & Lab., 101st Cong., *Legislative History of Public Law 101-336: The Americans with Disabilities Act* (Comm. Print 1990) .......... 22

H.R. Rep. No. 101-485, pt. 3 (1990) .......... 8

S. Rep. No. 101-116 (1989) .......... 6

Other Authorities

Jamelia N. Morgan, *Policing Under Disability Law*, 73 Stan. L. Rev. 1401 (2021) .......... 9

*Webster's Third New International Dictionary* (1966) .......... 7

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees. CAC also has a strong interest in ensuring that important federal statutes, like the Americans with Disabilities Act, are interpreted in a manner consistent with their text and history and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In other words, public entities may not, among other actions, discriminate against people with disabilities by excluding them from services, programs, and activities. To effectuate this prohibition, courts have long recognized that Title II imposes an affirmative obligation on public entities to provide reasonable

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. Counsel for Plaintiff-Appellant has consented to the filing of this brief; there is no docketed appearance on behalf of Defendants-Appellees.

accommodations that ensure people with disabilities receive meaningful access to the services, programs, and activities they provide. *See, e.g.*, *Montanez v. Price*, 154 F.4th 127, 146 (3d Cir. 2025); *Koon v. North Carolina*, 50 F.4th 398, 406 (4th Cir. 2022); *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1167 (10th Cir. 2021). And the Supreme Court has held repeatedly that Title II's sweeping language reaches prisoners in state custody, protecting them from discrimination "by reason of [their] disability." 42 U.S.C. § 12132; *see Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998); *United States v. Georgia*, 546 U.S. 151, 157 (2006).

Notwithstanding the obligation Title II imposes on public entities to provide accommodations that ensure meaningful access, Defendants denied John Williams, a Pennsylvania prisoner with neck and arm disabilities, a rigid neck brace, rigid wrist splints, and effective pain medication. *See* JA7-9; *id.* at 22. Williams requires those accommodations to access prison services and activities because his disabilities—which include damaged cervical vertebrae, spinal-cord nerve impingement, chronic bilateral carpal tunnel syndrome, and arthritis—cause him to have "a limited range of motion and debilitating pain in his neck, hands, fingers, and wrists." *Id.* at 42; *see id.* at 7. Absent accommodations that "immobilize and support his neck and hands and wrists adequately" and manage his pain, *id.* at 47, Williams experiences an "increased, debilitating level of . . . hot, fiery, pulsing pain" that "prevents him from reclining comfortably in bed and sleeping restfully" and "severely impedes,

and at times entirely prevents," him from participating in various everyday activities like eating, handwriting, gripping and holding objects, opening doors, lifting certain items, and cleaning himself after defecation, *id.* at 51-52; *see id.* at 7-8, 42-44.

The district court nonetheless held that Williams could not bring a claim under the ADA because it concluded, in part, that Williams's request for rigid braces to accommodate his neck and arm disabilities was actually a claim about medical "treatment decisions" and so fell outside Title II's protections. *Id.* at 24. That decision is at odds with the ADA's text, which prohibits discrimination with respect to *all* public "services, programs, [and] activities" and contains no exception for medical care. 42 U.S.C. § 12132. To be sure, courts have sometimes indicated otherwise, positing a "judge-made" exception to Title II's nondiscrimination mandate for medical care in prisons. But that case law stems from a single circuit-court decision that adopted an expressly atextual carveout from Title II for claims bearing on "the medical needs of . . . disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 248-49 (7th Cir. 1996). *Bryant* created that "[j]udge-made exception[]" to the ADA's broad textual protections to avoid the so-called "absurdity" of applying Title II to state prisoners, *id.*, a result the Supreme Court unanimously adopted just two years later, *see Yeskey*, 524 U.S. at 209. *Bryant* and its progeny are wrong and should not foreclose meritorious disability claims brought by state prisoners like Williams.

And even if such a carveout existed, Williams should still prevail because his request did not involve medical care at all. Instead, he sought a rigid neck brace, rigid wrist splints, and effective pain medication as accommodations for his neck and arm disabilities, to ensure he could meaningfully access the prison's nonmedical "services, programs, [and] activities." 42 U.S.C. § 12132. The statutory text of Title II contemplates exactly this category of "auxiliary aids" as accommodations that can enable a prisoner's "receipt of services or . . . participation in programs or activities provided by a public entity." *Id.* § 12131(2). And Williams's complaint specifically challenged his exclusion from nonmedical prison services and activities—including sleeping, eating, toileting, and pursuing basic hygiene—because of his neck and arm disabilities and "the debilitating level of pain and suffering that he experiences on a daily basis as a result thereof." JA44; *see id.* at 51-52.

The district court thus erred in construing Williams's ADA claim for disability accommodations as a claim for inadequate medical treatment and dismissing it *sua sponte* as beyond the scope of Title II. That is all the more true because dismissal occurred at the screening stage, when courts are "'obligat[ed] to liberally construe a *pro se* litigant's pleadings,' particularly where the *pro se* litigant is imprisoned." *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011), and then citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). This Court should reverse.

# ARGUMENT

## I. Title II of the ADA Bars Disability Discrimination in Prisons, Including Failures to Accommodate.

### A. As Its Text and History Show, Title II Broadly Forbids Disability Discrimination by Public Entities Like Prisons.

The Americans with Disabilities Act covers all individuals with any "physical or mental impairment that substantially limits one or more major life activities" or with a history or perception of such impairment. 42 U.S.C. § 12102(1). Its protections must be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted." *Id.* § 12102(4)(A). Title II of the ADA governs public entities, providing that "no [1] qualified individual with a disability shall, [2] by reason of such disability, [3] be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.

These statutory terms are sweeping. As relevant here, a "qualified individual with a disability" includes any "individual with a disability" who—with or without accommodation—meets the bare "essential eligibility requirements" of a public service, program, or activity. *Id.* § 12131(2). And "public entity" includes "any State or local government," as well as any department, agency, or subunit thereof. *Id.* § 12131(1)(A), (B). This far-reaching "language unmistakably includes State prisons and prisoners within its coverage." *Yeskey*, 524 U.S. at 209; *see Fauconier*

*v. Clarke*, 966 F.3d 265, 280 (4th Cir. 2020) ("Congress made [Title II] specifically applicable to the States and state entities, such as state prisons."). As the Supreme Court has unanimously recognized, "the ADA plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt." *Yeskey*, 524 U.S. at 209.

The expansive scope of Title II's text reflects Congress's plan in passing the ADA. Enacted in 1990, the statute established a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 2(b)(1), 104 Stat. 327, 329 (codified as amended at 42 U.S.C. § 12101(b)(1)). Its stated purpose was "to invoke the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." *Id.* § 2(b)(4); *see Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 529 (3d Cir. 2024) ("The purpose of the ADA is to ensure that persons with disabilities can participate equally in society."). The ADA thus "provide[s] a clear and comprehensive national mandate to end discrimination against individuals with disabilities . . . and to ensure that the Federal government"—including the federal judiciary—"plays a central role in enforcing these standards on behalf of individuals with disabilities." S. Rep. No. 101-116, at 2 (1989).

### B. There Is No Carveout to Title II for Prison Medical Care.

Medical care, like all other prison "services, programs, or activities," falls within Title II's nondiscrimination mandate. 42 U.S.C. § 12132. The statutory phrase "services, programs, or activities" is "extremely broad in scope and includes anything a public entity does." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019) (quoting *Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015)); *see* 28 C.F.R. pt. 35, app. B ("All governmental activities of public entities are covered."). More specifically, a "service" is "conduct or performance that assists or benefits someone," including "professional or other useful ministrations." *Service*, *Webster's Third New International Dictionary* (1966). As this Court has recognized, medical treatment, which seeks to diagnose or heal individuals' existing ailments and to prevent future ones, is a "service" for prisoners, *Montanez*, 154 F.4th at 147, and falls well within the "extremely broad" bounds of "services, programs, or activities," *Furgess*, 933 F.3d at 289 (quoting *Disability Rts. N.J.*, 796 F.3d at 301). And there is no carveout to Title II liability that exempts prison medical care from the statute's categorical nondiscrimination mandate for public entities. *Cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").

Indeed, it is well accepted that the ADA's broad bar on discrimination applies to medical care provided by public entities outside the prison context, *see, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 593-94, 607 (1999) (state care programs); *Rodde v. Bonta*, 357 F.3d 988, 995 (9th Cir. 2004) (county hospital), and Title II's "unambiguous statutory text" "provides no basis for distinguishing [prison] programs, services, and activities from those provided by public entities that are not prisons," *Yeskey*, 524 U.S. at 210, 212. Title II thus covers disability discrimination that occurs in the course of prison medical care. *See id.* at 210 ("Modern prisons provide inmates with many . . . medical 'services' . . . all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."); H.R. Rep. No. 101-485, pt. 3, at 50 (1990) (documenting that incarcerated people with disabilities face "discriminatory treatment" accessing medical care).

Such discrimination can occur in at least two ways. First, it violates Title II when prisoners with disabilities *receive differential treatment* from medical staff because of their disability. That adverse treatment might stem from a provider's "discriminatory motive, such as animus, fear, or apathetic attitudes" or "rest[] on stereotypes of the disabled rather than an individualized inquiry into the patient's condition." *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284-85 (1st Cir. 2006) (quoting *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001)). Or medical staff might

misunderstand a prisoner's disability as some other condition, like intoxication, and improperly deny medical services based on that misapprehension. *Cf.* Jamelia N. Morgan, *Policing Under Disability Law*, 73 Stan. L. Rev. 1401, 1433-34 (2021).

Second, it violates Title II when prisoners with disabilities are excluded from even *accessing* medical care because of their disability. Healthcare is a "quintessential service prisons must provide to prisoners." *Montanez*, 154 F.4th at 147. Title II thus bars prisons from excluding prisoners from medical care by failing to reasonably accommodate their disability. *See* 42 U.S.C. § 12132. Title II is violated, for example, if a prison refuses to provide accommodations that allow a prisoner who uses a wheelchair to access a medical office reachable only by stairs. So too if a prison denies a Deaf prisoner access to an ASL interpreter (or functional equivalent) necessary for interacting with a medical professional. Just as with any other service, program, or activity in a carceral setting, Title II requires that prisons provide reasonable accommodation to ensure that prisoners with disabilities can meaningfully access medical care. *See Montanez*, 154 F.4th at 147 (holding that a prisoner's denial of "meaningful access to 'medical care' *because of his disabilities*" is cognizable under Title II).

### C. Even if Title II Had a Medical Carveout, Disability Accommodations Under Title II Are Not Medical Care.

In any event, when prisoners like Williams seek disability accommodations under Title II to participate in nonmedical services, programs, or activities offered

by the prison, such requests are not properly understood as challenges to their medical care at all.

Title II requires prisons "to make reasonable accommodations" that ensure prisoners with disabilities meaningful access to their programs, activities, and services. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016); *see Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("Refusing to make reasonable accommodations is tantamount to denying access [to prison services]."); 42 U.S.C. § 12131(2) (contemplating "modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services"). After all, every public entity has an "affirmative obligation to make 'reasonable accommodations'" necessary for people with disabilities to "meaningfully access their programs, services, and activities." *Montanez*, 154 F.4th at 144 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985), and then citing *Tennessee v. Lane*, 541 U.S. 509, 532-33 (2004)). That obligation is "at its *apex* in the context of a prison," because "departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, J.).

Here, for example, Williams was excluded from basic prison services and activities because he has disabilities related to his neck (damaged cervical vertebrae

and spinal-cord nerve impingement) and arms (chronic bilateral carpal tunnel syndrome and arthritis of the hands, fingers, and wrists) that cause "a limited range of motion and debilitating pain in his neck, hands, fingers, and wrists." JA42; *see id.* at 7. Williams sought a rigid neck brace, rigid wrist splints, and effective pain medication as accommodations that took his existing neck and arm impairments as a baseline and would have intervened to provide meaningful access to prison activities and services (*e.g.*, eating, sleeping, and toileting) notwithstanding those disabilities. These accommodations were not medical treatment: he did not seek the brace, splints, or medication under Title II to improve or alter his underlying physical impairments.

To be sure, some interventions may be capable of operating as both a disability accommodation and a medical treatment, depending on the factual scenario. As an accommodation, a cane might help a prisoner with a mobility-related disability participate in programming in a distant wing of the facility. For another prisoner, the same cane may be a medically necessary part of treatment and recovery for a broken ankle. But the fact that a cane would, in this latter example, fulfill a different purpose for a different user in a different situation does not negate its role as a disability accommodation for those who need and seek it as such. Indeed, for some individuals, the same intervention may both accommodate a disability and treat a medical condition. *See Jackson v. Dameron*, 171 F.4th 641, 660 n.4 (4th Cir. 2026)

(Floyd, J., dissenting) (identifying "wheelchairs, crutches, braces," and other interventions that could be an accommodation and treatment for the same person).

A Title II failure-to-accommodate claim is not foreclosed by the existence of any other claims a prisoner might bring, including constitutional or tort-law claims about their medical care, and is available regardless of whether that prisoner's disability accommodation could also be (or is) a medical treatment. This fact is unsurprising: two distinct legal claims often arise out of the same fact pattern. A prison's mistreatment of a prisoner with certain health conditions or impairments can generate plausible claims under both Title II (for disability discrimination) and, say, the Eighth Amendment (for deliberate indifference to a serious medical need). The Supreme Court expressly recognized as much in *United States v. Georgia*, which considered the mistreatment of a paraplegic state prisoner. There, the Court acknowledged that the "same conduct that violated the Eighth Amendment also violated Title II of the ADA." *Georgia*, 546 U.S. at 157; *see id.* (discussing the "deliberate refusal of prison officials to accommodate" a prisoner's "disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" as both an Eighth Amendment violation and an "'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's 'services, programs, or activities'" in violation of Title II (alterations in original) (quoting 42 U.S.C. § 12132)); *Jackson*, 171 F.4th at 660 & n.4 (Floyd, J., dissenting)

(noting that in certain cases "the need for medical treatments arises simultaneously to the need for disability accommodations" because "both may stem from the same initial" issue).

Other courts have also acknowledged that even when medical professionals are involved, a single factual scenario may still give rise to both disability and medical-treatment claims. In *McDaniel v. Syed*, for example, a prisoner with mobility disabilities brought parallel ADA and Eighth Amendment claims when prison staff rejected his request for a no-stairs housing unit. *See* 115 F.4th 805, 818-19 (7th Cir. 2024). The court considered those claims separately, recognizing that Title II "address[es] mobility issues that affect a prisoner's ability to participate equally in programs and services, even if they might also relate to medical decisions" and emphasizing that "those decisions are not entirely off-limits from scrutiny under the ADA." *Id.* at 825; *see id.* at 825-26 ("Since *Georgia*, other circuits have treated decisions related to a prisoner's mobility as disability accommodation issues, not just as issues of allegedly inadequate medical treatment, even when medical staff were directly involved in denying a prisoner a claimed reasonable accommodation."). The court ultimately let McDaniel's disability claim proceed, notwithstanding the medical considerations linked to the denial. *See id.* at 812, 823, 828 (noting that prison "health-care professionals" believed that "walking up and down stairs[] could help McDaniel avoid developing muscle atrophy").

When a prisoner denied meaningful access to "services, programs, or activities" by reason of his disability seeks a particular policy modification, barrier removal, or auxiliary aid to restore such access, that request is one for a disability accommodation, not a medical treatment, and courts should assess it under Title II.

### D. "Judge-Made" Exceptions Cannot Overwrite Title II's Clear Text and Foreclose Required Accommodations.

Despite the broad sweep of Title II's text, some courts have held that certain failure-to-accommodate claims fall outside its statutory scope. These courts have concluded, first, that prisoners cannot bring ADA claims when those claims touch on prison medical care and, second, that a wide range of prison disability accommodations are actually requests for medical care (and so their denial is not actionable under Title II). Those cases largely draw on a single Seventh Circuit decision issued two years before the Supreme Court unanimously held that Title II applies to state prisons. *See Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996).[2]

---

[2] Although the court below did not cite *Bryant*, its holding traces directly back to that case via the two cases it does cite. The court below first explained its ADA decision with a quote from a district-court case, *Nuñez v. Prime Care Health, Inc.*, No. 19-CV-0859, 2019 WL 1400466 (E.D. Pa. Mar. 27, 2019). *See* JA24 (quoting *Nuñez*, 2019 WL 1400466, at *1 n.3). *Nuñez* in turn quoted *Bryant*'s statement that Title II "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nuñez*, 2019 WL 1400466, at *1 n.3 (quoting *Bryant*, 84 F.3d at 249).

The court below also quoted the unreported decision in *Kokinda v. Pennsylvania Department of Corrections*, 663 F. App'x 156 (3d Cir. 2016). *See* JA24 (quoting *Kokinda*, 663 F. App'x at 159). *Kokinda* quoted the decision it was

*Bryant* considered whether a paraplegic prisoner, who broke his leg when a spasm caused him to fall while sleeping, could bring a claim under Title II after prison officials denied him guardrails for his bed. *Id.* at 247-48. The court there held that Title II "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Id.* at 249. But that mischaracterized what Bryant alleged. He argued that he needed bed guardrails as an accommodation for his disability (paraplegia and concomitant leg spasms) to make sleeping accessible. *See id.* at 247. The court's rejection of his request as a "special accommodation," *id.* at 249, is precisely backward: the lack of accommodation *is* the very discrimination the court claimed Bryant had not adequately "alleged," *id.*—and directly violated the prison's "affirmative obligation" under Title II to ensure Bryant's meaningful access to prison services and activities like sleeping, *Montanez*, 154 F.4th at 144.

As this Court recognized while considering several district-court cases' reliance on *Bryant* in a decision concerning access to prison showers, "[t]he problem with these cases' analysis [applying *Bryant*] is that complaints about not being

---

reviewing, which in turn quoted *Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010). *See Kokinda*, 663 F. App'x at 159 & n. 11 (quoting *Kokinda v. Pa. Dep't of Corr.*, No. 2:15-cv-1593, 2016 WL 695819, at *4 (W.D. Pa. Jan. 13, 2016) (quoting *Simmons*, 609 F.3d at 1022)). And *Simmons*, too, quoted *Bryant*'s assertion that Title II "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Simmons*, 609 F.3d at 1022 (quoting *Bryant*, 84 F.3d at 249).

provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable accommodations so that inmates with disabilities can take a shower—just like able-bodied inmates." *Furgess*, 933 F.3d at 291; *see id.* at 290 (concluding that courts have "improperly relied" on *Bryant* to foreclose relief for claims that adequately allege disability discrimination).

Nor can *Bryant*'s reasoning hold up against the text of Title II, as the decision itself acknowledged, observing that "[j]udge-made exceptions to laws of general applicability are justified to avoid absurdity." *Bryant*, 84 F.3d at 248-49 (citation omitted); *see id.* at 249 (acknowledging that a postulated reading is "not express" in the statutory text).[3] As discussed above, there is no carveout to Title II's broad protections for discrimination in prison medical care. Indeed, there are many scenarios in which a prison's "fail[ure] to attend to the medical needs of its disabled prisoners," *id.* at 249, violates Title II, including when medical providers' treatment is improperly tainted by their reaction to a prisoner's disability, when medical

[3] The so-called "absurdity" *Bryant* invoked to justify its atextual carveout for prison medical care—namely, the idea that Title II covers state prisoners—was unanimously adopted by the Supreme Court two years later. *See Bryant*, 84 F.3d at 248 ("It is very far from clear that prisoners should be considered 'qualified individual[s]' within the meaning of the Act. Could Congress really have intended disabled prisoners to be mainstreamed into an already highly restricted prison society?" (alteration in original)). *Contra Yeskey*, 524 U.S. at 209-10.

services are inaccessible to prisoners with disabilities, or when the same fact pattern gives rise to both disability and non-disability-related claims.

## II. The District Court Erred in Dismissing Williams's ADA Claim.

Because Williams made out a *prima facie* claim of disability discrimination under Title II, the district court erred in concluding that his "ADA claim . . . is not plausible as pled." JA24. That error is especially striking because district courts screening prisoners' *pro se* complaints are "obligat[ed] to liberally construe [their] pleadings." *Dooley*, 957 F.3d at 374 (quoting *Higgs*, 655 F.3d at 339); *see Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*per curiam*); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*per curiam*).

**1.** First, Williams is a "qualified individual with a disability." 42 U.S.C. § 12132. His neck, hand, wrist, and finger impairments are disabilities under the ADA, affecting "major life activities" like "caring for oneself," "performing manual tasks," "sleeping," and "lifting." *Id.* § 12102(1)(A), (2)(A). And "with . . . the provision of auxiliary aids," namely a rigid brace and splints to immobilize his neck and arms, Williams could have participated in the services and activities the prison provided. *Id.* § 12131(2); *see id.* § 12103(1)(C) (defining "auxiliary aids" to include the "acquisition or modification of equipment or devices").

Second, Williams was "excluded from participation in" and "denied the benefits of the services, programs, or activities" administered by the prison. *Id.* § 12132. As alleged in his complaint, Williams has been "impede[d]" in his ability to "engag[e] in any physical activity that requires the repetitive use of his hands, arms, shoulders, upper back, upper chest, neck, and head" like "brush[ing] his teeth, button[ing] clothing, us[ing] eating utensils, or hold[ing] a drinking cup," or "cleaning . . . after defecation." JA52. He also "awakens several times during any period of sleep that he manages to attain sobbing, moaning, or whimpering from the pain." *Id.* at 51 (noting that Williams cannot "sleep[] restfully for more than . . . 2-4 hours of sleep per night").

He was thus excluded from various prison services and activities, including eating, sleeping, toileting, and pursuing basic hygiene. *See Montanez*, 154 F.4th at 147-48 (identifying "necessities for hygiene" and accessible sleeping conditions as "programs or services"); *Furgess*, 933 F.3d at 290 & n.16 (describing "meals" as a "program or activity" (quoting *Jaros*, 684 F.3d at 672)); *see also McDaniel*, 115 F.4th at 823 ("In a prison, qualifying programs and activities include meals, . . . toilets, and the like."); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1224 n.44 (9th Cir. 2008) ("Providing inmates with appropriate and adequate bedding and bathroom facilities are 'services' of the jail . . . . The jail was required to provide him with an adequate and appropriate means of relieving himself."); *Hall v. Higgins*, 77 F.4th

1171, 1181 (8th Cir. 2023) (recognizing that "the Jail's toilets, beds, and medical care are a 'service' under the ADA").

Third, that adverse treatment occurred "by reason of [Williams's] disability." 42 U.S.C. § 12132. Williams's neck and arm impairments caused the limited range of motion, dimmed vision, and "debilitating level of pain in his neck, shoulders, arms, hands, fingers, and wrists" that impeded or prevented his participation in these services and activities. JA51. Moreover, as this Court has recognized, a "plaintiff can meet [this] element of a prima facie case" by demonstrating "a failure to provide reasonable accommodations," as Williams's complaint does. *Montanez*, 154 F.4th at 148; *see* JA42-43; *id.* at 53.

To be sure, the district court suggested that the prison's eventual decision to give Williams "soft neck and wrist braces" was enough accommodation to defeat liability. *Id.* at 24. But the ADA does not merely command *some* accommodation for a prisoner's disability. Instead, prisons have an "affirmative obligation" to provide sufficient accommodation to enable a prisoner to "meaningfully access their programs, services, and activities" on the same terms as his nondisabled peers. *Montanez*, 154 F.4th at 144; *see supra* Section I.C. As Williams alleged, the soft braces he received (but had not requested) "lacked any therapeutic value whatsoever . . . because they did not properly immobilize and support [his] neck and wrists, and therefore would not relieve the pressure in his neck and hands and wrists that causes

his pain." JA45. That intervention thus fell far short of enabling meaningful access to the prison services and activities from which Williams was excluded—and certainly cannot justify the dismissal of Williams's Title II claim for *different* accommodations at this early screening stage.

**2.** The district court further rejected Williams's Title II claim on the ground that the prison's denials of rigid neck and wrist braces (in favor of soft ones) "are treatment decisions and do not provide a basis for a plausible claim" under the ADA. *Id.* at 24. That is error twice over. As described above, the ADA does not carve out medical care from Title II's sweeping ban on disability discrimination in public services, activities, and programs. The district court thus erred in suggesting that a Title II claim that deals with a prisoner's medical care could be dismissed for that reason alone. If the court understood Williams's Title II claim as challenging his medical care, it should have evaluated that claim under the same longstanding framework courts use to assess disability discrimination in all other domains, including both medical care outside of prisons and the mine run of other prison services.

To buttress its contention, the court below cited two cases, *Nuñez v. Prime Care Health, Inc.* and *Kokinda v. Pennsylvania Department of Corrections*. *See id.* at 24 (quoting *Nuñez*, 2019 WL 1400466, at *1 n.3, and then *Kokinda*, 663 F. App'x at 159). But neither unreported decision supports dismissal of Williams's ADA

claim. The *Nuñez* court did not "construe[]" Nuñez as raising an ADA claim at all, *see Nuñez*, 2019 WL 1400466, at *1, and, in footnoted dicta, suggested that, regardless, he did not "sufficiently ple[a]d" an ADA claim because he had not attributed his adverse treatment "to a disability," *id.* at *1 n.3. Here, Williams's complaint expressly included an ADA claim, *see* JA53 (alleging Defendants denied Williams "reasonable disability accommodation" "in violation of Title II"), and pleaded a failure to accommodate his disabilities, *see id.* at 53-55, which "meet[s]" the causal "element of a prima facie case" under Title II, *Montanez*, 154 F.4th at 148. Similarly, the *Kokinda* court acknowledged that Kokinda did "not challenge the dismissal of his ADA claim on appeal, and thus [the court did] not address it." *Kokinda*, 663 F. App'x at 158 n.2. The half-sentence it later included suggesting that prison medical care falls outside the ADA's scope is therefore dicta, *see id.* at 159, that flatly contradicts the broad text of Title II, *see supra* Section I.B.

In any event, the district court also erred by misunderstanding Williams's complaint. In the context of Williams's ADA claim, the requested rigid neck brace and wrist splints were accommodations for his neck and arm impairments. That claim was not a challenge to his medical care at all, but a claim about his exclusion from prison services and activities based on his physical disabilities, exactly the sort of discrimination by a public entity the ADA prohibits. To start, Title II identifies the "provision of auxiliary aids" as accommodations that can be used to facilitate the

"receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Supportive braces for body parts with physical impairments fall squarely within this category of auxiliary aids, which can enable people with disabilities—including neck and arm disabilities like Williams's—to receive services and participate in activities. Indeed, in testimony leading up to the passage of the ADA, the Executive Director of the President's Committee on Employment of People with Disabilities invoked a quadriplegic telephone operator with "limited use of her hands and arms" who used a rigid "metal hand splint" as part of "a reasonable accommodation to the limitations caused by her [hand- and arm-related] disability." *Hearing on H.R. 2273, the Americans with Disabilities Act of 1989: Joint Hearing Before the Subcomms. on Emp. Opportunities and Select Educ. of the Comm. on Educ. & Lab.*, 101st Cong. (1989) (statement of Jay Rochlin), *reprinted in* 2 H. Comm. on Educ. & Lab., 101st Cong., *Legislative History of Public Law 101-336: The Americans with Disabilities Act* 1559-60 (Comm. Print 1990).

**3.** Finally, the district court erred in ignoring Williams's ADA claim for effective pain medication. The court acknowledged that Williams had "filed an ADA disability accommodation request" that included "pain medication more effective than Ibuprofen or Naproxen." JA8; *see id.* at 44-45. But it nevertheless construed Williams's "claims under the ADA" "to be based on the refusal to issue

Williams rigid braces for his neck and wrists," with no reference to the denial of effective pain medication. *Id.* at 22. This too was error.

Williams's complaint plausibly alleged that denying him effective pain medication constituted a failure to accommodate his disabilities actionable under Title II. *See id.* at 55 (requesting relief including "pain medication for [Williams's] injuries that is as effective . . . as the Vicodin" prescribed by his free-world doctor); *id.* at 53 (alleging Williams was denied a "reasonable disability accommodation" under the ADA). And federal courts have long recognized under other ADA provisions that accommodations can be required to address disability-related pain. *See, e.g.*, *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 248 (2d Cir. 2025) ("In at least some circumstances, the ADA requires an employer to offer accommodations that mitigate (if not necessarily eliminate) an employee's disability-related pain."); *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 239 (D.C. Cir. 2018) ("A reasonable jury could conclude that forcing Hill to work with pain when that pain could be alleviated by his requested accommodation violates the ADA."); *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997).

"[C]onstruing the Complaint liberally," as this Court must, Williams "adequately pleaded" that, in refusing him effective pain medication, prison staff "denied a reasonable accommodation necessary for him to sleep" and participate in

other prison services and activities "without significant pain—'just like able-bodied inmates' [can]." *Montanez*, 154 F.4th at 148 (quoting *Furgess*, 933 F.3d at 291); *see id.* (noting "the lack of adequate pain medication" in assessing a Title II claim about a prisoner's "ability to sleep").

In short, by denying Williams the rigid neck brace, rigid wrist splints, and effective pain medication he requested, Defendants "excluded [him] from participation in" and "denied [him] the benefits of the [prison's] services, programs, or activities." 42 U.S.C. § 12132. Title II does not permit that discrimination, and the district court's *sua sponte* dismissal at the screening stage was error.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court as to Williams's ADA claim.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Joshua D. Blecher-Cohen
Nina G. Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: October 7, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,819 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

In accordance with Local Rule 28.3(d), I certify that I am a member of the bar of the Third Circuit in good standing.

In accordance with Local Rule 31.1(c), I certify that (i) this brief has been scanned for viruses using F-Secure Elements Agent Malware Scan and is free of viruses; and (ii) the text of this electronic brief is identical to that of the paper copies that will be filed with the Court.

Executed this 7th day of October, 2026.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: October 7, 2026

*/s/ Brianne J. Gorod*
Brianne J. Gorod